STATE, Respondent, v. MARSHALL, Appellant.†

Supreme Court

*No. 77–066–CR. Argued October 9, 1979.—
Decided November 6, 1979.*
(Also reported in 284 N.W.2d 592.)

† Motion for reconsideration denied, without costs, on December 21, 1979. BEILFUSS, C.J., took no part.

106

For the appellant there was a brief by *Robert Silverstein*, attorney, and *Luck & Rosenthal, S.C.*, of counsel, all of Milwaukee, with oral argument by *Mr. Silverstein*.

For the respondent the cause was argued by *David J.*

*Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

BEILFUSS, C.J.   The body of Thomas West was discovered at about 12:30 p.m., on February 20, 1975, on the floor of his apartment at 1921–B North 24th Place in the City of Milwaukee by an off-duty police officer who owned the building and had stopped to collect his rent. West had been shot three times with a shotgun at close range.

The defendant, Myles Walter Marshall, was originally charged with West's murder as a result of statements made to the police by one Jerry Lee Robinson who lived directly above West's apartment. Sometime after the date of the offense Robinson told police that on the night of the murder he was looking out the window of his apartment when he saw four men get out of a car and walk up to the porch of the building. One of the men returned to the car and removed a rifle or shotgun. Robinson stated that this man then went back to the porch and handed the gun to the defendant. The four men then entered the door of the building and disappeared from Robinson's view. A short time later, Robinson stated, he heard three shots coming from the downstairs apartment followed by a rumbling noise. He then watched as all four men exited the building, got back into the car and drove away.

On the basis of Robinson's statements to the police, a criminal complaint was issued charging defendant with first-degree murder, party to a crime. Following his testimony at a preliminary examination, defendant was ordered bound over for trial. The State subsequently submitted Robinson to several polygraph examinations at the State Crime Lab, however, and as a result of these tests, a state polygraph examiner concluded that, at least with

respect to some of his statements, Robinson was not being truthful. The defendant then moved the trial court to dismiss the preliminary hearing held in the matter and to find the complaint insufficient for the court to exercise personal jurisdiction over him.

A hearing was held on this motion and Robinson was again called to testify. At that hearing, however, Robinson refused to answer any questions. The trial court found Robinson in contempt for his refusal to cooperate, but nevertheless denied defendant's motion to dismiss and the matter proceeded to trial.

The date of the hearing on defendant's motion to dismiss had originally been set as the date on which defendant's trial was to commence. For that reason, another witness, Roosevelt Cummings, was also subpoenaed to appear in court on that day. Cummings occupied the cottage directly to the rear of the building in which West's and Robinson's apartments were located. On the night of the murder he had been watching television when he was interrupted by a knock at his front door. He answered the door and was asked by a person whom he had not seen before if a Tom Slick lived there. Realizing that this person was looking for Thomas West, Cummings directed him to the forward building and told him he would find the man he was looking for there.

As the person was leaving, Cummings observed a car, which had been parked on the street during the conversation, turn into the alleyway adjacent to the two buildings. The car stopped next to West's apartment. Cummings, who had remained at the door, watched as the person he had spoken with walked towards the car where he was asked by an occupant on the passenger side what he had learned. He responded that West lived in the rear apartment of the front building and continued

walking until he reached the rear door to that building. Cummings then observed two men get out of the car and join the other person on the porch outside of the apartment building. He watched until he saw these men knock on the door of the building and, at that point, he closed his own door and resumed watching television.

Shortly thereafter, Cummings heard loud voices and arguing coming from West's apartment. After about five to six minutes he heard a car start and back out of the alley. He then heard more loud noises and suddenly, three quick noises that sounded like muzzled gunshots. He immediately jumped up from his couch and turned off his light, but did not call the police because, as he later testified, he feared for his own safety.

Although Cummings was later shown a picture of the defendant by the police, along with a number of other pictures, he failed to identify him as the man who had come to his door looking for West on the night of the murder. In fact, on the same day as the murder, Cummings had picked out a photograph of one David Darnell Hardy as resembling the man who had asked him the whereabouts of Tom Slick. On August 18, 1975, however, as Cummings was sitting in the rear of the courtroom, he saw the defendant sitting a few rows in front of him and immediately recognized him as the man he had seen that night. He reported this to a police officer, and several days later a line-up was held at which Cummings again identified the defendant as the man who had come to his door the night of the murder.

As a result of his identification of the defendant and Robinson's refusal to testify, Cummings became the State's key witness at defendant's trial. On the basis of his testimony the jury found the defendant guilty as charged. A judgment of conviction was entered on April 21, 1976, and defendant was sentenced to life imprisonment in the State Reformatory at Green Bay, Wisconsin.

Four principal issues are presented on appeal:

(1) Did the trial court have jurisdiction over the person of the defendant?

(2) Was the courtroom identification of defendant by Roosevelt Cummings impermissibly suggestive such that its use at trial deprived defendant of due process?

(3) Was the evidence sufficient to support the jury's verdict?

(4) Did the trial court err in its evidentiary rulings regarding the testimony about the condition of the victim's body, the photograph of the victim and the jury view of the scene?

Defendant first contends that the trial court lacked jurisdiction over his person because both the complaint and the preliminary examination were based primarily upon statements of Jerry Robinson who was later shown to be unreliable as a result of polygraph examinations performed by the State. Because Robinson was shown to be untruthful in his statements about the murder, defendant argues, those statements should have been excised in determining the sufficiency of the complaint and the preliminary examination. And because, without those statements, both the complaint and the preliminary examination fail to establish probable cause, the trial court did not have personal jurisdiction over the defendant.

We find this argument defective in three respects. First, the trial court was under no obligation to take notice of the results of the polygraph examinations performed by Robinson. These tests were administered to Robinson solely on the initiative of the State, and no stipulation was entered into between the parties that the results of the tests would be used in evidence.

This court has held that such a stipulation is a primary prerequisite to the admissibility of the results of such

tests into evidence. *State v. Stanislawski,* 62 Wis.2d 730, 741, 216 N.W.2d 8 (1974).[1] Moreover, the requirement of a written stipulation applies whether the admission of such evidence is sought by the defense or by the state, and whether the proceeding at which its admission is sought is a full trial or merely a hearing.

Because no stipulation was entered into here, the trial court did not err nor abuse its discretion in its refusal to admit the test results into evidence at the hearing on the motion to dismiss. Because the polygraph results were the sole grounds for defendant's motion to dismiss, it also follows that the trial court did not err in denying the motion.

Secondly, defendant's argument fails because, even if a stipulation had been entered into, the results of the polygraph examinations administered to the State's witness were not relevant to the issues presented by defendant's motion to dismiss. The only issues presented by that motion were whether the complaint and preliminary examination were sufficient to demonstrate probable cause to believe that the defendant committed the crime for which he was charged.

Traditionally, this inquiry, with respect to the sufficiency of the complaint, has been limited to the factual allegations contained within the four corners of that document. Facts outside of the complaint were generally not to be considered in assessing its sufficiency, unless specifically incorporated by reference. *State v. Williams,* 47 Wis.2d 242, 252, 177 N.W.2d 611 (1970). This same rule was also followed in determining the sufficiency of a supporting affidavit for a search warrant. *State v. Mier,* 254 Wis. 180, 185, 35 N.W.2d 196 (1948).

[1] *See also State v. Streich,* 87 Wis.2d 209, 219, 274 N.W.2d 635 (1979); *Lhost v. State,* 85 Wis.2d 620, 648, 271 N.W.2d 121 (1978); *Zelenka v. State,* 83 Wis.2d 601, 613, 266 N.W.2d 279 (1978); *State ex rel. Harris v. Schmidt,* 69 Wis.2d 668, 230 N.W.2d 890 (1975).

Within the last decade, however, a number of courts began to move away from a strict application of the "four-corners" test when the truthfulness of an affiant's statements supporting an application for a search warrant was called into question. *See United States v. Lee* (4th Cir. 1976), 540 F.2d 1205, certiorari denied, 429 U.S. 894, and cases cited therein. This court also held at least implicitly on several occasions that it would not confine its review to the face of the affidavit where there were alleged material or intentional misstatements of fact by the affiant.[2]

And in the recent case of *Franks v. Delaware,* 438 U.S. 154 (1978), the United States Supreme Court held that a state court's refusal to allow a defendant to challenge the veracity of a sworn statement used by police to obtain a search warrant under any circumstances infringed upon Fourth and Fourteenth Amendment rights. Specifically, the court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." In the event the perjury or reckless disregard is established by a preponderance of the evidence, the court continued, the warrant must be voided and the fruits of the search suppressed. 438 U.S. at 155–56.

Defendant contends that this same rule applies not only to supporting affidavits for search warrants, but also to criminal complaints. Because Robinson was shown

---

[2] *State ex rel. Furlong v. Waukesha County Court,* 47 Wis.2d 515, 523–24, 177 N.W.2d 333 (1970); *Scott v. State,* 73 Wis.2d 504, 511, 243 N.W.2d 215 (1976); *Schmidt v. State,* 77 Wis.2d 370, 376, 253 N.W.2d 204 (1977).

to have been untruthful in his statements to the police, he argues, and because without his statements the complaint fails to show probable cause, the trial court should have granted his motion to dismiss.

The defendant overlooks an important fact. The statements which he alleges to be false were made not by the complainant, but by a citizen witness. This fact is quite significant since the rule that intentional misrepresentations must be excised applies only to misrepresentations by the affiant or complainant. We noted this distinction in the search warrant context in *Scott v. State, supra,* 73 Wis.2d at 511–12:

"Initially, we observe that the complainant made no patent misstatement of fact. The officer stated that he had been told by the informant that the latter had removed the substance from the apartment. The record reflects no reason to conclusively determine that the officer was not, in fact, told by the informant that he had removed the substance. The misstatement appears to have been that of the informant himself, although concededly the complainant admitted that he could not specifically remember exactly what the informant had told him. This distinguishes the case before us from those cited by the defendant for the proposition that when a material misstatement of fact relating to the existence of probable cause, based on an informant's 'tip,' is shown, the evidence obtained must be suppressed. *United States v. Carmichael* (7th Cir. 1973), 489 Fed. 2d 983; *United States v. Upshaw* (5th Cir. 1971), 448 Fed.2d 1218; *United States v. Harwood* (10th Cir. 1972), 470 Fed.2d 322; *United States v. Roth* (7th Cir. 1967), 391 Fed.2d 507. In those cases it was the complainant or affiant himself who was shown or alleged to have made patent misstatements."

Where the alleged misstatements are those of an informant or a witness rather than the complainant or affiant himself, the trial court is under no obligation

to conduct an immediate hearing so as to determine the truthfulness and materiality of those statements. That is the function of the trial. In determining the sufficiency of the complaint, the credibility of informants or witnesses is adequately tested by the two-pronged standard set out by the Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 114 (1964). *See United States v. Carmichael* (7th Cir. 1973), 489 F.2d 983, 989.

That test requires that a complaint or warrant affidavit establish (1) the underlying circumstances which show reason to believe the informant is credible, and (2) the underlying circumstances which show that the manner in which the informant reached his conclusions was reliable. *State v. Paszek*, 50 Wis.2d 619, 184 N.W.2d 836 (1971) ; *Ritacca v. Kenosha County Court*, 91 Wis.2d 72, 280 N.W.2d 751 (1979). This test was originally fashioned to test the credibility of police information obtained from confidential informants. In *State v. Knudson*, 51 Wis.2d 270, 277, 187 N.W.2d 321 (1971), we held that, "Essentially, the search for reliability in the case of a citizen informer is shifted to the second prong of the *Aguilar* test, *i.e.*, from personal reliability to 'observational' reliability." This is because of the substantial differences in character and motivation that usually exist between citizen-informers and unnamed and paid police contacts.

Applied to the facts of this case, then, it is clear that the complaint meets this test. Robinson was a citizen informer and, as such, his personal reliability could be found by the court in assessing the sufficiency of the complaint. With respect to the second prong of the test, the court could also find the manner in which Robinson supposedly obtained his information was also reliable. His statements were based on his direct personal observations. He lived directly over the apartment in which the

killing occurred and stated that he recognized the defendant because they had been classmates in high school. Information obtained in this manner is sufficiently reliable to meet the second prong of the *Aguilar* test.

Because this is the extent of the trial court's inquiry in determining whether a complaint shows probable cause, defendant's contention that Robinson had lied was irrelevant to the issues presented at the hearing on his motion to dismiss. This contention was likewise irrelevant to the question of the sufficiency of the preliminary examination.

We have held that "the purpose of the preliminary is not to make a final judgment on the credibility of [a witness]; the court's role [is] simply to ascertain the plausibility of her story and whether, if believed, it would support a bindover." *Vigil v. State*, 76 Wis.2d 133, 144, 250 N.W.2d 378 (1977). "The preliminary hearing ' ". . . is not the proper forum to debate and determine issues as to credibility and weight of evidence once essential facts as to probability have been established." ' " *State ex rel. Huser v. Rasmussen*, 84 Wis.2d 600, 614, 267 N.W.2d 285 (1978), quoting *State v. Knudson*, 51 Wis.2d at 280, and *State ex rel. Evanow v. Seraphim*, 40 Wis.2d 223, 228, 161 N.W.2d 369 (1968).[3] It therefore follows, as these cases have held, that a trial court does not err when it prevents a defendant from introducing impeachment evidence at such a hearing.

---

[3] Of course, this is not to say that a defendant is to be totally prevented from attacking the credibility of a witness in any manner whatsoever at this stage of the proceeding. Where a witness' testimony is so inherently or patently incredible, that his story is not even plausible, a defendant should be allowed to demonstrate this fact at the preliminary examination. *Wilson v. State*, 59 Wis.2d 269, 294–95, 208 N.W.2d 134 (1973); *State ex rel. Huser v. Rasmussen*, 84 Wis.2d at 614. Defendant's attack here, however, was upon the general trustworthiness of the witness rather than the plausibility of his story. It was therefore properly excluded.

Because the results of the polygraph examination of Robinson were, at most, merely impeachment evidence, they were irrelevant to the issue raised by defendant's motion to dismiss the preliminary examination.

Thirdly, we find defendant's jurisdictional argument to be factually defective. Underlying his whole argument is the factual assumption that Robinson's statements implicating him in the murder of Thomas West were not true. Nowhere, however, has this been shown. On the contrary, the jury's ultimate verdict in this case would seem strong support for the truthfulness of Robinson's statement that he had seen the defendant at the scene of the murder. The sole basis for this assumption that Robinson had not been truthful was the results of the polygraph examinations administered to him by the State. The opinions of the polygraph examiner were not conclusive nor even admissible under the facts of this case.

We therefore conclude the court had personal jurisdiction of the defendant.

Defendant next contends that his due process rights were violated by the identification of him by Roosevelt Cummings who ultimately became the State's key witness against him. He argues that that identification was the equivalent of an on the scene "show-up" identification and that it was unduly and impermissibly prejudicial and suggestive. Moreover, since there was no independent source for Cummings' identification of him, he claims, all subsequent identification testimony from Cummings should have been suppressed.

In *Stovall v. Denno,* 388 U.S. 293 (1967), the United States Supreme Court stated that where a defendant has been subjected to a confrontation with a supposed witness to a crime and that confrontation is "so unnecessarily suggestive and conducive to irreparable mistaken

identification" as to deprive him of due process, testimony concerning that identification should be excluded. Whether identification following such a confrontation actually offends due process is to be determined by "the totality of the circumstances surrounding it." 388 U.S. at 302.

Subsequent cases have made clear that, in making the determination of whether the identification evidence must be excluded, the court must first decide if the confrontation procedure was characterized by unnecessary suggestiveness, and then, if it was, the court must further decide whether, despite the unnecessary suggestiveness of the confrontation procedure, the totality of the circumstances show that the identification was nevertheless reliable.[4] Only where unnecessarily suggestive confrontation procedures have been used and, under the totality of circumstances the identification appears not to be reliable, is it to be excluded. ". . . reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations." *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977). *See also Simos v. State,* 83 Wis.2d 251, 265 N.W.2d 278 (1978).

Before this analysis is applied, however, it must first be determined whether the confrontation was deliberately contrived by the police for purposes of obtaining an eyewitness identification of the defendant. *Stovall, Biggers* and *Brathwaite, supra,* all involved planned confrontations between a suspect and a supposed witness to a crime orchestrated by the police for the sole purpose of having the witness identify the suspect as the perpetrator of

---

[4] *Fells v. State,* 65 Wis.2d 525, 537, 223 N.W.2d 507 (1974); *State v. Russell,* 60 Wis.2d 712, 721, 211 N.W.2d 637 (1973); *Neil v. Biggers,* 409 U.S. 188, 198 (1972).

that crime. It was the improper use of this particular police practice that was the focus of the United States Supreme Court's decisions in those cases. Where the confrontation is not part of a police procedure directed toward obtaining additional evidence, but occurs as a result of mere chance or for some other reason not related to the identification of the defendant, the rule announced in those cases does not apply.

Thus in *Jones v. State,* 63 Wis.2d 97, 216 N.W.2d 224 (1974), we upheld the use of identification testimony which resulted from an unplanned confrontation between a witness and suspect in the outer office or lobby of a district attorney's office. And in *State v. Brown,* 50 Wis.2d 565, 185 N.W.2d 323 (1971), a witness' identification of a defendant in police custody as he emerged from an elevator on his way from police headquarters to the district attorney's office was also held admissible. In both of these cases, the circumstances under which the witness viewed the defendant were more suggestive than those present here. We nevertheless held that the admission of testimony regarding those identifications did not violate the defendant's right to due process. The same conclusion follows here.

The record before us clearly shows that Cummings' identification of the defendant was not pre-arranged and was as much a surprise to the State as it was to the defendant. There is no evidence that Cummings appeared in court on the date of defendant's hearing for any reason other than in answer to his subpoena. He had been subpoenaed to testify at defendant's trial which was originally scheduled to begin on that day. Although he had not identified the defendant before this time, he was still a material witness for the State and could at least partially corroborate Robinson's story.

Even if this had been a confrontation planned by the police, however, defendant would still not be entitled to relief on this issue. For in our view there was nothing about the circumstances under which Cummings observed the defendant that was "so unnecessarily suggestive and conducive to irreparable mistaken identification" that he was denied due process of law. *Stovall v. Denno,* 388 U.S. at 302. At the *Wade*[5] hearing on this issue, Cummings testified that, upon his arrival at the courtroom, he took a seat in the back row. Prior to the calling of defendant's case, he saw the defendant sitting next to a woman about three rows in front of him in the visitors' section. There were several other people in the courtroom at this time. Cummings had not been told to identify the defendant and no one had indicated to him who the defendant was. Upon recognizing the defendant as the man who had come to his door looking for West on the night of the murder, Cummings immediately beckoned to the detective in charge of the case, went with him out into the hall, and told him of his discovery.

This situation is significantly different from the "show-up" confrontations condemned by the United States Supreme Court in *Stovall v. Denno,* 388 U.S. at 302, and in *Foster v. California,* 394 U.S. 440 (1969). In a "show-up," a lone suspect is presented to a witness who is then asked, "Is this the one?" The mere fact that the police themselves suspect this person and that he alone is presented to the witness strongly suggests that he in fact is the guilty party. An identification made under those circumstances is obviously a less reliable test of the witness' recollection than one resulting from a line-up or some other procedure. No "show-up" procedure, however, was used here. In fact no identification procedure was being used at all when Cummings first

---

[5] *United States v. Wade,* 388 U.S. 218 (1967).

recognized the defendant. The circumstances that did exist were not so suggestive as to encourage misidentification and thereby deprive defendant of due process.

Defendant also contends that the evidence adduced at trial was insufficient to support his conviction for the crime of first-degree murder, party to a crime. He argues that the only evidence presented by the State which in any way connected him with the murder of Thomas West was the testimony of Roosevelt Cummings. Even assuming Cummings' testimony to be accurate, he continues, it merely places him in the area, and at the approximate point in time, in which the crime occurred. There is no evidence that he was present when West was killed or that he even knew of what was happening.

The law governing this issue has been repeated often by this court:

> " '. . . when the question of the sufficiency of the evidence is presented on appeal in a criminal case the only question for this court is whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt. . . . This ultimate test is the same whether the trier of the facts is a court or a jury. . . . The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of the facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true.
> " '. . . Stating the rule conversely for the sake of clarity, the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as "beyond a reasonable doubt." ' " *Krueger*

*v. State,* 84 Wis.2d 272, 282–83, 267 N.W.2d 602 (1978), quoting *White v. State,* 45 Wis.2d 672, 677–78, 173 N.W. 2d 649 (1970), and *Lock v. State,* 31 Wis.2d 110, 114–15, 142 N.W.2d 183 (1966).

In addition, we have held that a conviction may be based in whole or in part upon circumstantial evidence, and that the test is the same whether the proof is by testimonial or circumstantial evidence.[6]

Applying these rules to the facts of this case, we hold that the evidence adduced at trial was sufficient to support the jury's verdict. From the testimony of Roosevelt Cummings, the jury was justified in believing that on the night of the murder the defendant stopped at Cummings' house and inquired as to the address of the victim. Cummings informed the defendant that the man he was looking for lived in the building directly across the yard. As the defendant was leaving Cummings' house, a car that had been parked on the street pulled into the alleyway adjacent to Cummings' home. One of the persons in that car asked the defendant what he had learned and the defendant told him where the victim lived. The defendant and the two occupants of the car then proceeded to the victim's door and knocked.

Although Cummings did not see anything further after this point, he stated that he heard loud voices and arguing coming from the victim's apartment. As the arguing continued, he heard someone start a car and back out of the alley. Then, within minutes of when he saw the defendant and his companions approach the victim's residence, he heard what sounded like three muffled gunshots. At that point he quickly jumped up and turned off his light. The next day the body of

[6] *State v. Koller,* 87 Wis.2d 253, 266, 274 N.W.2d 651 (1979); *Krueger v. State,* 84 Wis.2d 272, 283, 267 N.W.2d 602 (1978).

Thomas West was discovered on the floor of his apartment having been shot three times by a shotgun at close range.

From these facts we believe the jury could have reasonably inferred that either the defendant or one of his companions shot and killed Thomas West. It is not necessary that the defendant himself be the one who pulled the trigger. He was convicted not of directly committing the crime himself, but of being a party to the commission of it. Thus, it is only necessary for defendant to have been a willing participant.[7] Such participation as would constitute aiding and abetting does not even require that the defendant be present during the killing. Merely locating the victim for the murderer and bringing the two together could constitute aiding and abetting as could driving a get-away car once the offense was complete. One need not perform an act which would constitute an essential element of the crime in order to aid and abet that crime. It is only necessary that he undertake some conduct (either verbal or overt), which as a matter of objective fact aids another person in the execution of a crime, and that he consciously desire or intend that his conduct will in fact yield such assistance.[8]

In the case before us, even if one of his companions, and not the defendant, actually shot Thomas West, defendant's overt conduct clearly aided that person in the execution of the crime as a matter of objective fact. For it was his conduct that at the very least led the actual killer to his victim.

Although there is no direct evidence here establishing that defendant actually intended to aid in the execution

[7] *State v. Cydzik*, 60 Wis.2d 683, 698, 211 N.W.2d 421 (1973).

[8] *Taylor v. State*, 55 Wis.2d 168, 178, 197 N.W.2d 805 (1972); *Roehl v. State*, 77 Wis.2d 398, 407, 253 N.W.2d 210 (1977); *Hawpetoss v. State*, 52 Wis.2d 71, 78, 187 N.W.2d 823 (1971).

of the crime, we believe that the jury could reasonably have inferred such intent from the facts before it.

By its very nature, intent is an elusive element and is rarely susceptible to proof by direct evidence. *Garcia v. State,* 73 Wis.2d 174, 183, 242 N.W.2d 919 (1976). Because one generally intends the consequences of his acts, intent can often be inferred from those acts and their consequences.[9]

From the fact that the defendant sought and obtained the address of Thomas West and led his companions to the door of West's apartment where either he or one of his companions shortly thereafter fired three shotgun blasts into West's body at close range, we believe that a jury could reasonably infer that the defendant intended West's death. As the State aptly points out, "[O]ne does not go out after midnight in the company of others armed with a shotgun looking for another individual, who is then murdered with that shotgun minutes after he is found, without knowing that such murder was intended." A shotgun is hardly the type of weapon that can be easily concealed so that the defendant would have been unaware of its presence. The fact that loud arguing ensued immediately upon the entry into the victim's apartment, and that the killing occurred within minutes of that entry, renders improbable the theory that the killing had not been planned beforehand. In light of all of these circumstances we are unable to say, as a matter of law, that no jury could have reasonably convicted the defendant of the crime charged.

Lastly, defendant contends that the trial court erred in permitting the jury to hear and view highly prejudicial

[9] *Jacobs v. State,* 50 Wis.2d 361, 366, 184 N.W.2d 113 (1971); *Johnson v. State,* 85 Wis.2d 22, 32, 270 N.W.2d 153 (1978); *State v. Cydzik,* 60 Wis.2d at 697.

and inflammatory evidence. The specific evidence defendant refers to as being highly prejudicial and inflammatory includes: (1) the testimony of an investigating officer who, in describing the condition of the victim's body when he arrived on the scene, stated, "There was an opening in the abdomen and the intestines were coming out"; (2) a photograph of the victim; and (3) the scene of the crime.

Of these three, only the testimony of the police officer comes close to being prejudicial or inflammatory. The photograph of the victim shown to the jury did not show the nature and extent of the victim's wounds or exhibit in any way the brutal manner in which the victim was killed. The photograph showed only the victim's face and was not " '. . . of such a character as to arouse sympathy or indignation, or divert the minds of the jury, to improper or irrelevant considerations. . . .' " *Neuenfeldt v. State,* 29 Wis.2d 20, 33, 138 N.W.2d 252 (1965), certiorari denied, 384 U.S. 1025 (1966).

In ordering a view of the scene, the trial court was proceeding under sec. 972.06, Stats., which states simply, "The court may order a view by the jury." Under the facts of this case not only was a view of the scene not prejudicial or inflammatory, but must have been of great assistance to the jury in reaching its verdict. The location of the victim's apartment and its relationship to, and distance from, the cottage occupied by Cummings were important facts the knowledge of which would necessarily have helped the jury in assessing the credibility of the State's witness. Moreover, the record shows that the jury was specifically instructed that the view of the scene was not evidence and was not to be considered by it as evidence. It was also instructed that the time of day and the environment were different at the time of the

murder from what they were as it viewed the scene. These instructions were sufficient to correct any misapprehension the jury may have had.

Finally, with respect to the testimony of the police officer, we find nothing so inflammatory or prejudicial about his statement that the trial court was required to have it stricken from the record. It was simply one response made to a long line of questioning as to what the officer saw when he came on the scene. The State did not dwell on the condition of the victim's body or attempt to describe his wounds in great detail. If the jury had been allowed to view a picture vividly showing the victim's wounds, the defendant might have had grounds for complaint. Under the circumstances that actually existed, however, we find none.

*By the Court.*—Judgment and orders affirmed.