STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Kurt RUNDLE, Defendant-Appellant.

Supreme Court

*No. 91–1971–CR. Oral argument March 31, 1993.—Decided June 18, 1993.*

(Also reported in 500 N.W.2d 916.)

986

For the plaintiff-respondent-petitioner the cause was argued by *Jerome S. Schmidt,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there were briefs by *Peter J. Kovac* and *Kovac Law Offices,* Milwaukee and oral argument by *Peter J. Kovac.*

SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals, *State v. Rundle,* 170 Wis. 2d 306, 488 N.W.2d 125 (Ct. App. 1992), reversing two convictions in the Circuit Court for Kenosha County, Michael S. Fisher, Circuit Judge. On June 21, 1990, the defendant, Kurt Rundle, was convicted in a jury trial of being a party to the crimes of intentional and reckless physical abuse of his daughter by intentionally aiding and abetting[1] the phys-

---

[1] Section 939.05 provides:

(1)  Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the

ical abuse inflicted by his wife, contrary to sec. 948.03(2)(b)[2] and sec. 948.03(3)(a), Stats. 1991-92.[3] The court of appeals reversed the convictions, holding that the evidence was insufficient to establish the defendant's guilt as an aider and abettor to the crimes as charged. The court of appeals noted that the evidence might have supported a conviction under sec. 948.03(4), Stats. 1991-92, which criminalizes the failure to act to prevent a child's bodily harm.[4] The state, however, did not charge the defendant under that statute.

person who directly committed it has not been convicted or has been convicted of some other crime based on the same act.

(2) A person is concerned in the commission of the crime if he:

(a) Directly commits the crime; or

(b) Intentionally aids and abets the commission of it; or

(c) Is a party to a conspiracy . . .."

[2] Section 948.03(2)(b) provides:

(2) Intentional causation of bodily harm. (b) Whoever intentionally causes bodily harm to a child is guilty of a Class D felony.

[3] Section 948.03(3)(a) provides:

(3) Reckless causation of bodily harm. (a) Whoever recklessly causes great bodily harm to a child is guilty of a Class D felony.

[4] Section 948.03(4) provides:

(4) Failing to act to prevent bodily harm. (a) A person responsible for the child's welfare is guilty of a Class C felony if that person has knowledge that another person intends to cause, is causing or has intentionally or recklessly caused great bodily harm to the child and is physically and emotionally capable of taking action which will prevent the bodily harm from occurring or being repeated, fails to take that action and the failure to act exposes the child to an unreasonable risk of great bodily harm by the other person or facilitates the great bodily harm to the child that is caused by the other person.

(b) A person responsible for the child's welfare is guilty of a Class D felony if that person has knowledge that another person intends to cause, is causing or has intentionally or recklessly caused bodily harm to the child and is physically and emotionally capable of taking action which will prevent the bodily harm from occurring or being repeated, fails to take that action and the failure to act exposes

Our order granting the state's petition for review framed the issue for review as follows:

> In a prosecution for the intentional and reckless physical abuse of a child, as a party-to-those-crimes ('PTAC'), contrary to secs. 948.03(2)(b), 948.03(3)(a) and 939.05, Stats., must the state prove that the defendant undertook some affirmative action against the child or is the evidence sufficient where the state proved that the defendant was a parent of the victim, he was present during the administration of physical abuse by his spouse, he failed to intervene to prevent physical abuse, he failed to report that physical abuse and if he failed to cooperate with medical personnel by not informing them how the victim sustained her injuries so that proper medical care could be undertaken?[5]

the child to an unreasonable risk of bodily harm by the other person or facilitates the bodily harm to the child that is caused by the other person.

[5] In addition to arguing in the court of appeals (and in this court) that the evidence was insufficient to convict him as an aider and abettor to the crime of child abuse, the defendant argued several other errors.

First, the defendant argued that each count in the indictment charged him with more than one criminal act and that the jurors were not advised that some of alleged criminal acts applied to one count but not the other. He argued that combining more than one act into a single count permits a jury to convict a defendant even though its members are not in unanimous agreement about the acts in which the defendant engaged.

Second, the defendant argued that intentional conduct and reckless conduct embody alternative states of mind which are mutually exclusive and that, in charging him for the same conduct under both the intentional and reckless provisions of sec. 948.03, the state violated the double jeopardy provisions of the state and federal constitutions. He argued that the charges should have been presented to the jury in the alternative.

989

We conclude that the legislature intended that, in order to obtain a conviction under secs. 948.03(2)(b), 948.03(3)(a) and 939.05(2)(b), Stats. 1991–92, the state must prove the elements of aiding and abetting. The state must prove (1) that the defendant undertook some conduct (either verbal or overt) that as a matter of objective fact aided another person in the execution of a crime; and (2) that the defendant had a conscious desire or intent that the conduct would in fact yield such assistance. For the reasons set forth, we conclude that the state did not prove aiding and abetting. Accordingly we affirm the decision of the court of appeals.

## I.

The material facts are not disputed for purposes of this appeal. On August 6, 1989, K.R., the three and one-half year old daughter of the defendant, was admitted to the Milwaukee County Children's Hospital. Upon her arrival at the hospital, the child was comatose, and covered with bruises and scratches of various ages. Medical personnel found that her injuries were consistent with "shaken baby syndrome," a condition marked by bleed-

---

Finally, the defendant argued that the manner in which the jury instructions were presented led the jurors to believe that they could convict both defendants if they found one defendant guilty. One example of the jury instructions about which the defendant complains is the following:

> If you are satisfied beyond a reasonable doubt from the evidence in this case that *either defendant,* as a party to the crime, intentionally caused bodily harm to [the child] . . . you should find the defendant guilty. (emphasis added).

The court of appeals did not address these issues, because it held for the defendant on the grounds of insufficiency of evidence. We limited our review on the petition to review, and we do not address these issues.

ing on the brain.[6] K.R. is blind and probably suffers from permanent brain damage and physical injuries as a result of the abuse.

Kurt Rundle was charged with four counts of child abuse, two relating to incidents in 1986[7] and two to incidents in 1989. Pamela Rundle was charged with two counts of child abuse relating to incidents in 1989 and one count of child abuse relating to an incident in 1988.[8] Pamela Rundle was convicted of all charges, and the court of appeals affirmed her convictions.[9] Kurt Rundle was acquitted of the two charges connected with incidents alleged to have taken place in 1986. He was convicted of one count of intentionally causing a child bodily harm and one count of recklessly causing a child great bodily harm as a party to the crimes.

The facts supporting the two convictions stem from two incidents which occurred between July 24, 1989, and

---

[6] "Shaken baby syndrome" is caused by severe shaking which results in the shearing of blood vessels in the child's brain.

[7] In March of 1986, when K.R. was only seven weeks old, she was brought to the hospital with various bruises on her body and exhibiting signs of "shaken baby syndrome." When questioned by medical authorities, both parents claimed that the injuries occurred when the baby fell off the changing table while being changed by Kurt Rundle. The child was removed from the Rundle home at that time for a period of seven to eight months; she was returned to the home after the parents had undergone parental training.

[8] In October of 1988, K.R. was again brought to the hospital, this time with various bruises on her body and a severely cut lip. At that time Pamela Rundle explained that the injuries stemmed from the fact that K.R. was clumsy and fell a lot. The child was removed from the home for approximately six months at that time; she was returned to the home in May 1989.

[9] *State v. Rundle,* 166 Wis. 2d 715, 480 N.W.2d 518 (Ct. App. 1992).

August 6, 1989, which Kurt Rundle described to John Shlax, a social worker from the Department of Health and Social Services. The first incident occurred on July 30, 1989. On that day Pamela Rundle picked the child up and threw her several feet into the hallway of their home. Kurt Rundle, who is hearing impaired, was not present in the room at the time, but he came rushing in after feeling the vibrations from the child's fall. The second incident occurred between August 3rd and 5th in a parking lot in Madison, Wisconsin. The child had been misbehaving in the car during the return from a trip to the northern part of the state. Pamela Rundle stopped the car, pulled the child out of the car, slapped her in the face, kicked her in the knee, and dragged her by the arm so hard that she fell off her feet. Kurt Rundle told the social worker that the child might have been hurt during this incident, because he subsequently observed the child acting strangely.

Kurt and Pamela Rundle were tried together. The state's theory in prosecuting Kurt Rundle was that he aided and abetted his wife's abusive behavior. The theme of the prosecution's questioning of witnesses and closing argument was that the defendant was guilty because he "stood back" and did nothing to protect his child's physical well-being against his wife's abuse.[10]

Much of the evidence introduced at trial detailed the constant and horrific abuse the child endured at the hands of Pamela Rundle. Family and friends of the Rundles, testifying about the child's plight, reported that they had seen Pamela Rundle slap, shake, and throw the

---

[10] Characteristic of the state's argument is this question posed to the jury: "How could Kurt Rundle be innocent of any unlawful intent when he stood back and let this go on and on . . .?"

child with as little provocation as the child's refusal to express her love for her mother.

When questioned about Kurt Rundle's role in the abuse, these same witnesses testified that the defendant did not act to prevent his wife from abusing the child. Other witnesses testified that they had discussed Pamela Rundle's abuse of the child with the defendant and that he had agreed that he should do something. One witness, Kurt Rundle's brother, testified that there were times he heard the defendant ask Pamela Rundle to stop striking the child and that at other times the defendant remained silent when his wife was slapping, striking or shaking the child.

Several witnesses who acknowledged seeing Kurt Rundle physically discipline the child on occasion testified that he did not discipline her in a forceful or injurious manner, and that he did not cause her harm. Other witnesses testified that they had never seen the defendant strike, slap or shake the child. The social worker testified that Kurt Rundle was the child's primary caretaker, that the child had a loving relation with her father, and that on one occasion the child kicked and screamed when placed in her mother's arms.[11]

The court of appeals reversed the defendant's convictions, concluding that "while the evidence may show that he was passively involved in the abuse, it is insufficient to establish his guilt as a party to the crimes as

[11] She further testified that on several occasions she had observed that "it was almost always Kurt that [the child] sought out to do any parental task. If she was hurt, she would go to Kurt for comfort. If she needed something, she would ask Kurt. . . . If she was spilling something, if she attempted to leave the room, it was Kurt that got up and tended to her or made sure that she was not doing something dangerous."

charged." We granted the state's petition for review and affirm the decision of the court of appeals.

## II.

This case presents a single issue: To sustain a conviction for aiding and abetting intentional and reckless physical abuse of a child, contrary to secs. 948.03(2)(b), 948.03(3)(a) and 939.05, Stats. 1991-92, must the state prove that the defendant undertook some affirmative action against the child or is it sufficient that the state prove that the defendant was a parent of the victim, was present during the administration of physical abuse by his spouse, failed to intervene to prevent physical abuse, failed to report that physical abuse, and failed to cooperate with medical personnel by not informing them how the victim sustained her injuries so that proper medical care could be undertaken?

In its case against the defendant, the state's principal theme was that Kurt Rundle did nothing to prevent his child from being abused by his wife. After eliciting evidence of the defendant's presence at the two incidents in 1989 and of his passivity, the state apparently concluded that it need not establish any further facts and ceased its inquiry. Although the burden of proof was on the state to prove every essential element of the crime charged beyond a reasonable doubt, the state made no effort to demonstrate that the defendant's behavior actually assisted his wife's physical abuse or was intended to do so, or that his behavior encouraged Pamela Rundle's abusive acts by leading her to believe he was willing to help her. The record does not support a finding that the defendant in any way conveyed approval of or gave assistance to the commission of the criminal acts. The state was satisfied with and rested on the evidence that Kurt Rundle did nothing.

994

The state makes two claims in support of its position that the convictions should be affirmed. First, relying on *State v. Williquette,* 129 Wis. 2d 239, 385 N.W.2d 145 (1986), the state argues that the defendant's failure to intervene constitutes aiding and abetting intentional and reckless child abuse. Second, the state argues that evidence introduced at trial reasonably supports an inference that the defendant engaged in verbal or overt conduct which constituted aiding and abetting of the intentional and reckless abuse of the child. We find neither argument persuasive.

### III.

In *State v. Williquette,* 129 Wis. 2d 239, 385 N.W.2d 145 (1986), upon which the state relies, a mother of two children was convicted under the then-existing child abuse statute, sec. 940.201, Stats. 1985–86, because she was aware that her husband was sexually and physically abusing the children, and she did nothing to prevent that abuse. The court held that a parent who fails to take any action to stop child abuse can be prosecuted pursuant to sec. 940.201 Stats., as a principal for exposing the child to the abuse. *Id.* at 256. Section 940.201, Stats. 1985–86, provided as follows:

> **940.201** Abuse of children. Whoever tortures a child or subjects a child to cruel maltreatment, including, but not limited, to severe bruising, lacerations, fractured bones, burns, internal injuries or any injury constituting great bodily harm under s. 939.22(14) is guilty of a Class E felony. In this section, 'child' means a person under 16 years of age.

The *Williquette* court concluded that the language of sec. 940.201, Stats. 1985–86, specifically the phrase "subjects a child to cruel maltreatment," includes situa-

tions "in which a person with a duty toward a child exposes the child to foreseeable risk of abuse." *Id.* at 249. It held that sec. 940.201 did not require an overt act of abuse to impose liability on the mother when the mother knowingly exposed her children to the risk of abusive conduct. *Id.* at 250.

The state's reliance on *Williquette* is misplaced. First, *Williquette* held only that a parent who exposes a child to abuse could be convicted under 940.201, Stats. 1985-86, as a person who directly commits the crime. The *Williquette* court did not reach the question addressed by the court of appeals in that case, namely whether the mother had violated sec. 940.201, Stats. 1985-86, by aiding and abetting the father in abusing the children.[12] In this case, the prosecution was not based on the theory that the defendant directly committed the crime; the theory of the state's case was that the defendant was an aider and abettor. Thus the *Williquette* decision, which determined who is a direct participant in the crime of child abuse under sec. 940.201, Stats. 1985-86, does not assist us in determining what conduct constitutes aiding and abetting child abuse.

Second, this case does not arise under sec. 940.201, Stats. 1985-86, the statute at issue in *Williquette*. It arises under sec. 948.03(2)(b) and sec. 948.03(3)(a), provisions adopted in 1987, effective July 1, 1989. These provisions are part of a new chapter 948 which addresses crimes against children, adopted as a result of the proposals of the Wisconsin Legislative Council Special

---

[12] *State v. Williquette,* 125 Wis. 2d 86, 370 N.W.2d 282 (Ct. App. 1985).

Justice Bablitch concurred in the opinion of this court in *Williquette,* reasoning that the mother was liable as an aider and abettor. 129 Wis. 2d at 262.

Committee on Crimes Against Children.[13] The new child abuse law, sec. 948.03(2) and sec. 948.03(3), uses significantly different language than sec. 940.201, Stats. 1985-86, and now penalizes any person who intentionally or recklessly causes bodily or great bodily harm to a child. The key statutory language in sec. 940.201—"subjects a child to cruel maltreatment"—that enabled the *Williquette* court to conclude that a parent who did not intervene to stop the physical abuse of a child was criminally liable as a person who directly committed the crime of child abuse was eliminated in the new statutes.

Section 948.03 penalizes intentional causation of bodily and great bodily harm and reckless causation of bodily and great bodily harm.[14] Section 948.03(2) and sec. 948.03(3) proscribe several types of conduct abusive to children and provide varying penalties for child abuse depending on the nature of the offender's actions, the degree of harm inflicted and the relationship of the offender to the child.

Section 948.03 also includes a statutory provision explicitly criminalizing the failure of a person who is responsible for the child's welfare to act to prevent bodily harm. Section 948.03(4)(a) provides:

(4) FAILING TO ACT TO PREVENT BODILY HARM.

---

[13] Section 940.201, Stats. 1985-86 was repealed effective July 1, 1989. *See* 1987 Wis. Act 332, sec. 28. The child's injuries were inflicted between July 24 and August 26, 1989. The complaint was filed on November 22, 1989.

[14] Wis. Legislative Council Staff, Legislation on Crimes Against Children, Report No. 7 to the 1987 Legislature (April 21, 1987), p. 12; Wis. Legislative Council Staff, New Law Relating to Crimes Against Children (1987 Wisconsin Act 332), Information Memo 88-2 (April 29, 1988), pp. 5-6.

(a) A person responsible for the child's welfare is guilty of a Class C felony if that person has knowledge that another person intends to cause, is causing or has intentionally or recklessly caused great bodily harm to the child and is physically and emotionally capable of taking action which will prevent the bodily harm from occurring or being repeated, fails to take that action and the failure to act exposes the child to an unreasonable risk of great bodily harm by the other person or facilitates the great bodily harm to the child that is caused by the other person.

A legislative council memorandum explains that "the failure-to-act provisions [of sec. 948.03(4)] codify the interpretation of the current child abuse statute by the State Supreme Court in *State v. Williquette* . . .. The State Supreme Court in Williquette determined that a violation of the child abuse statute may occur where a parent knowingly exposes a child to a foreseeable risk of abuse or fails to act to prevent abuse."[15]

The Wisconsin Legislative Council Committee notes to sec. 948.03 further explain that the 1987 revision clarifies the ambiguous statutory language "subjects a child to cruel maltreatment" and responds to "the criticism that [sec. 940.201] fails to adequately address the problem of child abuse resulting from the failure of a responsible person to take action to prevent child abuse when capable of doing so." The notes further state that, although the *Williquette* decision construed the previous statute to apply to the failure to prevent abuse, the then-existing "statutory language does not specifically deal

---

[15] Wis. Legislative Council Staff, New Law Relating to Crimes Against Children (1987 Wisconsin Act 332), Information Memo 88-2 (April 29, 1988), p. 6.

with this subject. The revision specifically corrects this statutory deficiency in sub. (4)."[16]

It is apparent from the language and structure of sec. 948.03 and the statute's legislative history that the legislature intended sec. 948.03(2) and 948.03(3) to proscribe affirmative conduct and sec. 948.03(4) to proscribe acts of omission of a responsible person who is capable of taking action to prevent child abuse. The obvious purpose of drafting several subsections in sec. 948.03 was to deal separately with intentional and reckless acts which cause bodily harm or great bodily harm and the failure to act to prevent another from inflicting such harm. Addressing various types of behavior in separate subsections permitted the legislature to vary the penalties based on the nature of the conduct involved and the degree of harm caused to the child.[17]

The legislature deliberately enacted sec. 948.03(4) to penalize the conduct described in the *Williquette* decision. Thus, adopting the holding of *Williquette,* the legislature declared that a parent who fails to prevent child abuse is liable as one who directly commits the crime of child abuse. The question for the court then is whether the legislature intended that the state can bypass sec. 948.03(4) by charging a defendant as a aider and abettor of intentional and reckless child abuse. In other words, when the legislature adopted sec. 948.03(4), did it intend that a defendant's failure to prevent child abuse could satisfy the requirements of aiding and abetting?

---

[16] Comments to West's Wis. Stat. Ann. sec. 948.03, p. 114 (Cum. Ann. Pocket Part 1992).

[17] Wisconsin Legislative Council Staff, Discussion Paper 86-1A, *Crimes Against Children A. Physical and Psychological Abuse* (July 17, 1986).

One of the elements of aiding and abetting is that the defendant engage in some conduct (either verbal or overt), that as a matter of objective fact aids another person in the execution of a crime.[18] The state reasons that in the case of a parent, who has a legal duty to protect the child, failure to act to protect the child satisfies the requirement of verbal or overt conduct under aiding and abetting. Relying on *Williquette*, the state contends that the special duty imposed on the defendant by virtue of his parent-child relationship with the victim brings the defendant within the provisions of sec. 948.03(2) and sec. 948.03(3) as an aider and abettor, distinguishing the defendant from a mere "bystander,"

[18] *State v. Martinez,* 150 Wis. 2d 47, 52, 441 N.W.2d 690 (1989) (quoting *State v. Marshall,* 92 Wis. 2d 101, 122, 284 N.W.2d 592 (1979)). *See also Hawpetoss v. State,* 52 Wis. 2d 71, 78, 187 N.W.2d 823 (1971); *State v. Nutley,* 24 Wis. 2d 527, 554–55, 129 N.W.2d 155 (1964).

Stated somewhat differently, "[a] person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a crime, he knowingly either (a) renders aid to the person who commits the crime, or (b) is ready and willing to render aid, if needed, and the person who commits the crime knows of his willingness to aid him. However, a person does not aid and abet if he is only a bystander or spectator, innocent of any unlawful intent, and does nothing to assist or encourage the commission of a crime. . . ." Wis. J.I.—Crim. 400 (1962).

For another formulation of the aider and abettor test, *see Roehl v. State,* 77 Wis. 2d 398, 407, 253 N.W.2d 210 (1977): "[W]here one person knew the other was committing a criminal act, he should be considered a party thereto when he acted in furtherance of the other's conduct, was aware of the fact that a crime was being committed, and acquiesced or participated in its perpetration."

and thus permitting the inference that the defendant intended to aid the commission of the crime.

Cases from other jurisdictions, some of which the state cited, buttress the state's position. These courts have acknowledged that substantive crimes of physical harm and the aiding and abetting statutes generally require affirmative conduct rather than nonaction. Yet after examining legislative intent they have interpreted their statutes as penalizing a parent for failure to act to protect a child. *See, e.g., Illinois v. Peters,* 224 Ill. App. 3d 180, 586 N.W.2d 469 (1991) (mother who knowingly failed to protect her child from abuse could be prosecuted under the accountability statute as an aider and abettor); *North Carolina v. Ainsworth,* 426 S.E.2d 410 (N.C. Ct. App. 1993) (mother who failed to take any steps to prevent her son from being sexually abused was held criminally liable for rape on theory of aiding and abetting); *North Carolina v. Walden,* 293 S.E.2d 780 (N.C. 1982) (mother could be convicted of offense of assault with a deadly weapon on aiding and abetting theory solely on basis that she was present when son was assaulted by his brother but failed to take reasonable steps to prevent assault); *Maryland v. Fabritz,* 276 Md. 416, 348 A.2d 275 (1975) (mother convicted for direct commission of child abuse because she failed to seek medical attention for her daughter after the daughter had been assaulted); *Palmer v. Maryland,* 223 Md. 341, 164 A.2d 467 (1960) (mother convicted for involuntary manslaughter for failing to protect her child from mother's abusive boyfriend); *New Mexico v. Adams,* 89 N.M. Ct. App. 737, 557 P.2d 586 (1976) (father convicted of child abuse for failing to protect his child from the abuse of the child's mother); *Commonwealth v. Howard,* 265 Pa. Super. 535, 538, 402 A.2d 674 (1979) (mother convicted of involuntary manslaughter for fail-

1001

ing to protect child from mother's abusive boyfriend).[19] *See also* Roberts, Annot., *Validity and Construction of Penal Statute Prohibiting Child Abuse,* 1 A.L.R. 4th 38 at 99 (1980). Several of these courts have also recognized that parents should be held to a legal duty to act only where they are *capable* of acting to protect the child. *See, e.g., North Carolina v. Walden,* 293 S.E.2d 780, 786 (N.C. 1982) (concluding that a reasonable duty does not include requiring that parents "place themselves in danger of death or great bodily harm in coming to the aid of their children"); *People v. Peters,* 224 Ill. App. 3d 180, 586 N.W.2d 469, 476 (1991) (concluding that aiding and abetting by failing to act is penalized "when it is reasonably possible" for the mother to act).

These cases illustrate the judicial process of finding legislative intent and interpreting statutes as including perpetration of a crime by parental omission when the statutes on their face proscribe only acts of commission. Yet the statutes involved in these cases are significantly different from secs. 948.03(2), (3), and (4). In this case, unlike in the cited cases from other jurisdictions, the legislature has specifically addressed the question of fail-

---

[19] For discussions of criminal liability based on omission to act, *see, e.g.,* Hall, General Principles of Criminal Law 190-205 (2d ed. 1960); LaFave and Scott, Substantive Criminal Law sec. 3.3 (1986); Frankel, *Criminal Omissions: A Legal Microcosm,* 11 Wayne L. Rev. 367 (1965); Hughes, *Criminal Omissions,* 67 Yale L.J. 590 (1958); Kerchheimer, *Criminal Omissions,* 55 Harv. L. Rev. 615 (1942); Seney, *"When Empty Terrors Overawe"—Our Criminal Law Defenses,* 19 Wayne L. Rev. 947 (1973); Leavens, *A Causation Approach to Criminal Omissions,* 76 Cal. L. Rev. 547 (1988); Kleinig, *Criminal Liability for Failures to Act,* 49 Law & Contemp. Probs. (3d) 161 (1986).

ure to act,[20] declaring within sec. 948.03(4) that failure to act is a crime.

The state does not explain why this court should interpret sec. 948.03(2) and sec. 948.03(3) as including failure to act when read in conjunction with the aider and abettor statute when the legislature specifically punished this conduct in sec. 948.03(4). We recognize that simply because conduct falls within one statutory provision does not mean it is excluded from another. If an act forms the basis for a crime punishable under more than one statutory provision, prosecution may proceed under any or all provisions. Section 939.65, Stats. 1991–92. But in interpreting secs. 948.03(2), (3), and (4) it does not make sense to say that the legislature intended sec. 948.03(2) and sec. 948.03(3), read in conjunction with the aider and abettor statute, to do away with the need for the state to prove some conduct, either verbal or overt. It does not make sense to say that the legislature intended that sec. 948.03(2) and sec. 948.03(3), when read in conjunction with the aider and abettor statute, are equivalent to the crime set forth in sec. 948.03(4). Such an interpretation makes sec. 948.03(4) redundant and meaningless. Such an interpretation also contravenes the legislative history which clearly demonstrates that sec. 948.03(4) was adopted to fill a deficiency in the child abuse statutes. In sec. 948.03(4) the legislature has specified which omissions to act are unlawful. Further judicial interpretation of the aiding and abetting statute and secs. 948.03(2) and 948.03(3) is unnecessary. Thus we conclude that sec. 948.03(2) and sec. 948.03(3), read

[20] *See Porter v. State,* 570 A.2d 823 (Ct. Crim. App. Ala. 1990), for a discussion of a statute that imposes liability on a defendant either for aiding and abetting or for failing to prevent a crime when there is a legal duty to act.

in conjunction with the aider and abettor statute, require the state to prove conduct, either verbal or overt, that as a matter of objective fact aids another person in the execution of a crime.

The state urges the court not to interpret sec. 948.03(4) as providing the exclusive means of prosecuting cases involving nonactive physical child abuse. The state asserts that such a holding would be detrimental to the prosecution of child abuse cases in which there is disparate culpability between the two parents, explaining the difficulty such an interpretation would create as follows:

> These cases often involve children who are either too young or too severely injured to provide credible testimony. Consequently, prosecutors must often rely on circumstantial evidence and testimony from one or both parents. In such cases, because the parents are often the only witness to the conduct, the prosecutor is not always able to determine the active or passive role of each of the parents in the physical abuse. Therefore, the prosecutor may choose to charge both as parties-to-the crime. The state asserts that interpreting sec. 948.03(4) as providing the exclusive means of prosecuting cases involving non-active physical child abuse has the practical effect of preventing prosecutors from permitting juries to determine criminal liability in these cases when there is no direct evidence of the active or passive role of each of the parents of a physically abused child except the testimony of those parents. State's Brief, pp. 7–9.

The state does not explain why in such cases it cannot charge the defendant under sec. 948.03(4), as well as aiding and abetting.

1004

We do not hold that sec. 948.03(4) is the exclusive means of prosecuting cases involving non-active physical child abuse. Nor are we restricting the prosecutor's discretion to decide which charges to file. We merely hold that, having chosen to charge the defendant as an aider and abettor, the state must prove that the defendant aided and abetted the perpetrator in the intentional and reckless abuse of the child.

## IV.

As we stated previously, aiding and abetting consists of two elements: (1) some conduct (either verbal or overt), that as a matter of objective fact aids another person in the execution of a crime; and (2) conscious desire or intent that the conduct will in fact yield such assistance. However, the state argues that even if it is required to prove that the defendant engaged in verbal or overt conduct, sufficient evidence was presented at trial to support the convictions.

To support its position that the defendant engaged in either verbal or overt conduct the state argues that the defendant physically disciplined the child; that he failed to cooperate with medical authorities by failing to inform them or misrepresenting how the child sustained her injuries; and that he aided in the continuation of the child's abuse by dressing the child in seasonally inappropriate clothing to conceal injuries which might have been discovered by her nursery school teachers.

In testing the sufficiency of the evidence, an appellate court will not substitute its judgment for that of the jury unless, under all of the evidence presented, the jury could not have found guilt beyond a reasonable doubt. If any possibility exists that the jury could have drawn the

appropriate inferences from the evidence adduced at trial to find the requisite guilt, we will not overturn a verdict. *State v. Alles,* 106 Wis. 2d 368, 377, 316 N.W.2d 378, 382 (1982). We conclude that a jury acting reasonably could not have inferred that any of the alleged conduct aided and abetted the abuse of the child.

Several witnesses did testify that they had seen Kurt Rundle physically discipline his daughter. These witnesses also stated that the acts of discipline were not injurious.[21] Furthermore the incidents relating to the defendant's discipline of the child all took place at least eighteen months prior to the 1989 incidents which are the basis of the charges in this case. These earlier acts of apparently reasonable discipline do not support an inference that, over eighteen months later, they somehow aided or abetted the wife to commit abusive acts that resulted in the child's permanent injuries.

In arguing that the defendant acted overtly because he refused to cooperate with the authorities, the state's brief relies on the defendant's statements to doctors after the 1989 incidents. The state's allegation that the defendant withheld information from medical authorities concerning the 1989 incidents seems more consistent with a theory that the defendant was an accessory after the fact than with a claim that he assisted or encouraged the abuse as it was occurring. It has been recognized that the "accessory after the fact, by virtue of

---

[21] The testimony of these witnesses relating to physical discipline by Kurt Rundle is as follows:

"Kurt would bawl out [the child] or shake her. That's all. You know. He'd kind of hold her by her shoulder and shake her and say, 'Shame on you, don't do that.' " "I probably saw it a few times."

"Sometimes he would shake and pull, but not much." But "he did it lightly. . . ."

"Kurt would take her by the shoulder and shake her and say, 'Now you've got to listen to your mother.' "

his involvement only after the felony was completed, is not truly an accomplice in the felony. This category has thus remained distinct from others, and today the accessory after the fact is not deemed a participant in the felony but rather one who has obstructed justice. . . ." LaFave and Scott, Substantive Criminal Law sec. 6.6 at 125 (1986).

The state does not appear to be relying on a pattern of defendant's failing to cooperate with medical authorities to support its position, nor could it. Neither the 1986 nor the 1988 incident supports an inference that the defendant engaged in overt conduct which aided the abuse. In the 1986 incident the defendant was acquitted, an indication that the jury did not believe he was lying to medical authorities when he gave his account of how the child sustained her injuries. As for the incident in 1988, the record indicates that it was Pamela Rundle who told medical authorities that the child sustained her injuries when she fell while playing. The social worker testified that all her communications were with Pamela Rundle and that she could not recall whether the defendant was present.

Finally, the record does not support an inference beyond a reasonable doubt that the defendant dressed his daughter inappropriately to conceal her bruises from discovery by nursery school teachers. The relevant testimony reveals only that the child wore long pants most of the time in the summer.[22] No evidence ties the defendant to having dressed the child in this manner. While

---

[22] The portion of the record which the state points to in support of this assertion comes from the questioning of a teacher in a day care center which the child attended from June through August of 1989. The relevant testimony is as follows:

Q:   Did you at any time see any other marks on [the child]?

some witnesses characterized the defendant as the primary caretaker, according to the record, both parents took care of the child. Nothing in the record indicates any efforts by either parent to hide the child's marks and bruises. We conclude that the evidence of the child's manner of dress cannot support a finding beyond reasonable doubt that the defendant engaged in overt conduct that as a matter of objective fact aided his wife in the execution of the crimes, or consciously desired or intended that the conduct would yield such assistance.

The crime in this case was brutal. Pamela Rundle has been convicted of abusing her own child. Nevertheless we must conclude, as did the court of appeals, that while the evidence shows that the defendant may very well be guilty of the crime set forth in sec. 948.03(4), the evidence is insufficient to establish the defendant's guilt as an aider and abettor to the crimes as charged. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

STEINMETZ, J. *(dissenting).* The evidence indicating that the defendant was the victim's parent—was present when his spouse physically abused his child, failed to intervene and prevent the abuse, and failed to report the abuse to the proper authorities—was suffi-

A: No. she was fully dressed, wore long pants most of the time, and she was potty trained, so I didn't have opportunity to see any other parts of her body.

Q: This is during the summer months?

A: Yes.

Q: And what type of long pants did she wear?

A: She wore long to the ankle pants. Sometimes corduroys. Short sleeved shirt.

cient to support the jury verdict convicting Kurt Rundle of physical abuse of his daughter by aiding and abetting the physical abuse inflicted by his wife. I believe that Kurt's presence during and failure to stop his wife's abusive acts was an objective fact which aided his wife in the execution of a crime. Kurt also obviously intended his conduct to in fact render such assistance.

In 1986, when she was only seven weeks old, K.R. was admitted to the hospital with symptoms of "shaken baby syndrome." K.R. was subsequently removed from the Rundle home while both Kurt Rundle and Pamela Rundle underwent training in proper parental care. K.R. was returned to the Rundle home in November 1986.

In October 1988, K.R. was taken to the hospital with a cut lip extending almost through to the inside of her mouth. As before, K.R. was removed from the Rundle home, this time for approximately six months.

On July 30, 1989, Pamela Rundle threw K.R. into the hallway of the Rundle home. Although Kurt was not in the room at the time of this act, he responded to the incident because he felt the vibrations from K.R.'s landing.

Sometime between August 3rd and August 5th, 1989, in a Madison parking lot, Kurt observed Pamela slap K.R. in the face, kick K.R. in the knee, and drag K.R. until she fell to the ground. Kurt believed the child had been hurt during this incident because he subsequently observed the child acting strangely. On August 6, 1989, K.R., then three years old, arrived at the Milwaukee County Children's Hospital comatose and covered with bruises and scratches.

Pamela Rundle was charged with one count of child abuse for the incident in 1988. Both Pamela and Kurt were charged with two counts of child abuse for the incidents in 1989. Kurt was convicted of the counts

related to the 1989 incidents. Pamela was convicted of all charges against her.

Kurt Rundle, who was K.R.'s father and not a mere bystander, intentionally failed to stop or report his wife's abusive acts. This behavior is consistent with his own acts toward the child in 1986, even though he was acquitted of those charges. I believe that this behavior constitutes an affirmative, overt act which aided and abetted his wife's abuse of K.R. The incident in 1988 made Kurt aware of his wife's abusive treatment prior to 1989. Despite this knowledge, Kurt failed to protect K.R. from the 1989 incidents. When K.R. was thrown on July 30, 1989, the resulting vibrations must have been severe because Kurt felt them while absent from the room where the incident took place. Still, Kurt did nothing to protect K.R. from further abuse. Finally, Kurt believed that K.R. had been seriously and permanently hurt during the August 1989 incident in the Madison parking lot; nevertheless, he did nothing.

I fail to see the difference between a lookout during a burglary, who objectively aides the principal burglar by merely watching for possible danger, and Kurt's conduct in this case, which objectively aided his wife's abuse by effectively guarding against intervention by others. Similarly, a person who sits as a passenger in a stolen car knowing the car is stolen may be guilty of aiding and abetting the theft of an auto. The passenger's conduct is no more affirmative than Kurt's conduct, yet the majority concludes that Kurt is not an aider and abetter.

It is difficult to understand the criteria used by this agency in returning this child more than once to these abusive parents until she became blind and disabled.

For the foregoing reasons, I dissent.

I am authorized to state that JUSTICES ROLAND B. DAY and JON P. WILCOX join this dissenting opinion.