**Michael L. PIASKOWSKI, Petitioner,**

v.

**Steve CASPERSON, Respondent.**

No. 99–CV–1428.

United States District Court,
E.D. Wisconsin.

Jan. 8, 2001.

T. Christopher Kelly, Thomas Kelly Habermehl & Mays, Madison, WI, for Petitioner.

Thomas J. Balistreri, Wisconsin Department of Justice, Office of the Attorney General, Madison, WI, for Respondent.

## DECISION AND ORDER

GORDON, District Judge.

Thomas Monfils worked at the James River paper mill in Green Bay, Wisconsin until November 21, 1992, when an unknown number of his coworkers beat him nearly to death, tied a heavy weight to his neck, and dumped his unconscious body into a vat of paper pulp to die. Six defendants were convicted of participating in the murder, including petitioner Michael Piaskowski, who seeks a writ of habeas corpus.

No physical evidence tied Mr. Piaskowski to the crime, no testifying witness saw him participate in it, no one confessed, there was no testimony from the petitioner or any other witness establishing that he took part in the murder or intended to. The state argued that although he did not kill Mr. Monfils directly, he either conspired with or aided and abetted those who did. The theory has only two sources of support: (1) the fact that the petitioner

reported the victim missing only minutes after his disappearance and (2) evidence that suggested that Mr. Piaskowski was with the other five defendants shortly before the crime began and with some of those defendants a few minutes later.

This evidence is insufficient to sustain the petitioner's conviction for party to the crime of first degree murder. Because I find that the Wisconsin appellate court's decision to the contrary resulted from an unreasonable application of the constitutional standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this court will grant Mr. Piaskowski's petition for a writ of habeas corpus. In light of this disposition, I need not consider the petitioner's other arguments in favor of issuing the writ.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The 911 Call

On November 10, 1992, the Green Bay Police Department received an anonymous 911 call that Keith Kutska, an employee at the paper mill, intended to steal an expensive electrical cord from his employer. The caller was Thomas Monfils, also an employee at the mill. When Mr. Kutska tried to leave at the end of his shift, a security guard asked to inspect his bag. Although employees are required to submit to such checks, he refused and left the plant. He received a five-day unpaid suspension for refusing to open the bag.

Mr. Kutska became determined to uncover the identity of the caller, and he told others at the mill, including Mr. Monfils, that he planned to obtain a tape of the call from the police. Mr. Monfils, fearing for his life, called the police and begged them not to give the tape to Mr. Kutska. They did anyway. Mr. Kutska picked it up on Friday, November 20, 1992 and upon listening to it immediately recognized the voice on the tape as that of Mr. Monfils.

Mr. Kutska hatched a plan to file "union charges" against Mr. Monfils. In order to get Mr. Monfils to admit that he was the caller, Mr. Kutska decided to surprise Mr. Monfils by playing the tape in the presence of two witnesses. Randy LePak and Mr. Piaskowski, who would both be at work with Mr. Kutska and Mr. Monfils the next day, agreed to witness the confrontation.

### B.   November 21, 1992

Early the next morning, on November 21, 1992, Mr. Kutska returned from suspension and brought the tape to play for his coworkers. Mr. Kutska was assigned to the No. 9 paper machine, along with three fellow workers. Mr. Monfils and Mr. Piaskowski were among the four employees working the No. 7 paper machine. The machines, which were long and very large, were placed end-to-end in a long line. Across from and parallel to the machines were four control rooms or "coops"; each machine had a large and small coop across from it. Halfway between the two large coops was a water fountain or "bubbler".

Mr. Kutska repeatedly played the tape for his coworkers, and news of the tape spread throughout the mill. About twenty people heard the tape before Mr. Monfils disappeared. Shortly after seven, Mr. Monfils and Mr. Piaskowski went into the No. 7 coop, and Mr. Kutska and Mr. LePak followed them in. As planned, Mr. Kutska played the tape and got Mr. Monfils to admit that he had made the call. Mr. Kutska told him that his conduct had been malicious, then left. On his way out Mr. Piaskowski said, "Geez, Tom, I just fuckin' don't believe you'd do that." Mr. LePak said to Mr. Monfils, "you can thank your fuckin' lucky stars you didn't do it to me, or I'd have killed you", then Mr. LePak also left.

Mr. Kutska then went to the No. 9 coop and played the tape for a number of people, including the five other men who would later be convicted with him for participating in Mr. Monfils' murder: Mr. Piaskowski, Michael Hirn, Reynold Moore, Dale Basten and Michael Johnson.

Mr. Monfils left the No. 7 coop to perform a periodic task called a "turnover" on the No. 7 machine. He finished at about 7:35 a.m. Between 7:45 and 8:00, Mr. Piaskowski, at Mr. Kutska's urging, called his supervisor to report that Mr. Monfils was missing, ostensibly for the purpose of getting him in trouble. Mr. Piaskowski told the supervisor that "some heavy shit [was] coming down". A search began.

Mr. Monfils' body was found the next day in a pulp vat. A heavy weight had been tied around his neck with a rope. He died from inhaling the pulp or from being strangled by the rope, or both. He had been beaten severely.

### C. Investigation, Trial and Subsequent Proceedings

The crime prompted a massive investigation and intense media attention. The sensationalist nature of the story was no doubt enhanced by the police department's decision, on the day before the murder, to give Mr. Kutska the 911 tape. The facts recited above came to light soon after the murder, and investigators surmised that Mr. Monfils was murdered between 7:30 and 8:00 a.m. on November 21. However, the lack of evidence to show who committed the crime delayed the filing of charges for more than two years.

The charges were brought in April 1995, when Mr. Kutska's friend, Brian Kellner, told police that Mr. Kutska had drunkenly admitted that he, Reynold Moore, Michael Hirn, Michael Johnson, Dale Basten and Mr. Piaskowski confronted Mr. Monfils by the bubbler shortly after the 7:35 turnover. Mr. Kellner told police that Mr. Kutska said that certain members of this group (he did not include Mr. Piaskowski), yelled at Monfils, then pushed and hit him. According to Mr. Kellner, Mr. Kutska claimed that he had to leave at that point in order to fix a problem with his machine.

The trial lasted 28 days, and more than 60 witnesses testified. Very little of the evidence was relevant to Mr. Piaskowski's guilt. Besides Mr. Kellner, only two other witnesses gave testimony relevant to pre-cisely how the murder occurred and who did it: David Wiener and James Gilliam.

On November 21, Mr. Wiener was working near the vat where the victim was found. He told police that he saw nothing on that day. He testified to that effect in March 1993, but in May of that year, Mr. Wiener claimed to have a sudden recovered memory in which he saw Mssrs. Basten and Johnson carrying something heavy toward the vat on the day in question. He could not see what they were carrying because a machine blocked his view. At the time of his trial testimony in 1995, he was serving a prison sentence for killing his brother. A handwriting expert testifying for the prosecution identified Mr. Wiener as the probable author of a fake suicide note, purportedly written by Mr. Monfils; the same expert excluded the six defendants as possible authors. Mr. Wiener gave no testimony regarding Mr. Piaskowski's involvement in the murder of Mr. Monfils.

Mr. Gilliam was a jailhouse informant who testified that while he and Mr. Moore were in jail together, Mr. Moore told him about the confrontation near the bubbler. Mr. Gilliam's testimony corroborated Mr. Kellner's testimony in some respects, but Mr. Gilliam claimed that Mr. Moore told him that Mr. Kutska punched the victim in the face and stayed until the beating was over. However, Mr. Gilliam did not state that Mr. Piaskowski was present during the confrontation.

The jury convicted all six defendants on October 28, 1995. The Brown County Circuit Court denied Mr. Piaskowski's post-conviction motions in May 1997, and the Wisconsin Court of Appeals affirmed the judgment in September 1998. The Wisconsin Supreme Court denied review. Mr. Piaskowski timely filed his habeas corpus petition in this court.

### II. ANALYSIS

Mr. Piaskowski's primary argument is that the evidence was insufficient to support his conviction. The state concedes

that he has properly raised and exhausted this argument in the state courts, thus preserving it for federal habeas corpus review.

■ The Due Process Clause of the Fourteenth Amendment prohibits the criminal conviction of any person "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Once a jury convicts, however, due process requires reversal only if, after viewing the evidence in the light most favorable to the prosecution, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The question for a court of review is not whether it would have convicted but whether any reasonable jury could have found guilt beyond a reasonable doubt.

The standard is more rigorous for federal habeas corpus petitioners who, like Mr. Piaskowski, filed their petitions after the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"]. *See Gomez v. Acevedo,* 106 F.3d 192, 200 (7th Cir.), *vacated on other grounds,* 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997). The AEDPA amended 28 U.S.C. § 2254 to provide that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; ....

Here the Wisconsin appellate court applied the correct legal rule (though it did not cite *Jackson* ), and there is no factually on-point United States Supreme Court decision, so the "contrary to" clause of Section

2254(d)(1) may be ignored. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519–20, 146 L.Ed.2d 389 (2000). Therefore, as the parties recognize, Mr. Piaskowski can obtain relief only if the Wisconsin appellate court's decision involves an "unreasonable application" of *Jackson. See id.* at 1520.

Mr. Piaskowski's conviction is thus insulated against reversal by two layers of "reasonableness" review. In order for him to succeed, I must conclude not only that no rational jury could have convicted him (*Jackson* ) but also that the Wisconsin appellate court's determination to the contrary was objectively unreasonable (§ 2254(d)(1)). *Williams,* 120 S.Ct. at 1521. For the reasons that follow, I find that Mr. Piaskowski has carried this burden.

## A. *Jackson*

■ Deciding whether the evidence was sufficient under *Jackson* requires the court to refer to the specific elements of the crime as defined by state law. *Jackson,* 443 U.S. at 324 & 324 n. 16, 99 S.Ct. 2781. The state argues that although Mr. Piaskowski did not directly kill Mr. Monfils, he is equally liable for the homicide as a party to the crime. He is a party to the crime if he either (1) aided or abetted it or (2) conspired with the perpetrators to commit it. § 939.05(2), Wis. Stats. Aiding and abetting has two elements: (1) some conduct (either verbal or overt), that as a matter of objective fact aids another person in the execution of a crime; and (2) conscious desire or intent that the conduct will in fact yield such assistance. *State v. Rundle,* 176 Wis.2d 985, 1005, 500 N.W.2d 916 (1993). The two elements of conspiracy are an agreement among two or more persons to accomplish a criminal objective and an individual intent to accomplish that objective. *State v. Hecht,* 116 Wis.2d 605, 625, 342 N.W.2d 721 (1984).

■ The State, in its briefs to this court and earlier to the Wisconsin appellate court, relies upon only a few pieces of

specific evidence to support Mr. Piaskowski's guilt. This evidence can be divided into two groups. The first group consists of evidence that tends to establish the petitioner's presence, at certain places or with certain people, immediately before and after the crime. The most important item in this group is Mr. Kellner's testimony, which, if credited, establishes that Mr. Piaskowski was near the bubbler just as a verbal confrontation with Mr. Monfils began to turn violent. The State also emphasizes that the petitioner was with Mr. Moore and Mr. Kutska in the No. 7 coop moments after Mr. Monfils' disappearance. The second category consists of evidence that relates to Mr. Piaskowski's phone call to his supervisor. It is undisputed that the petitioner reported Mr. Monfils missing at Mr. Kutska's request, and that Mr. Piaskowski told his supervisor that some "heavy shit" was "coming down".

█ Based on the evidence, no reasonable jury could have found Mr. Piaskowski guilty of each element of the crime under either of the theories offered by the prosecution, for two reasons. First, the evidence does not permit a jury, acting rationally, to conclude beyond a reasonable doubt that Mr. Piaskowski was at the bubbler when the confrontation began. Second, even accepting that he was, all of the state's evidence and all of the reasonable inferences that can be drawn from it can establish nothing more than his presence during a part of the crime. The settled law of Wisconsin provides that "mere presence and ambivalent conduct" at the scene of a crime does not prove that a defendant is a conspirator or an aider and abetter. *See, e.g., Piaskowski,* 1998 WL 644758 at *3 (conspiracy) *(citing Hecht,* 116 Wis.2d at 627, 342 N.W.2d 721); *State v. Haugen,* 52 Wis.2d 791, 191 N.W.2d 12 (1978) (conspiracy and aiding and abetting); *State v. Rundle,* 176 Wis.2d 985, 994, 1005–06, 500 N.W.2d 916 (1993) (standing by and doing nothing while a crime is committed does not constitute aiding and abetting).

Of the pieces of evidence relied upon by the state, only one is contested. This is Mr. Kellner's testimony placing Mr. Piaskowski by the bubbler. The state has never seriously disputed that this evidence is critical, and it is especially so for Mr. Piaskowski. This testimony cannot establish beyond a reasonable doubt that the petitioner was at the bubbler when the confrontation became violent.

First, as the trial court observed, Mr. Kellner had little, if any, credibility. The trial court had the opportunity to evaluate his credibility, both at trial and at a postconviction hearing at which he recanted his testimony that certain defendants, including the petitioner, were at the confrontation by the bubbler. In his decision on the defendants' postconviction motions, the judge observed that he regarded Mr. Kellner as "barely credible" at the time of trial. The trial court noted that Mr. Kutska was very drunk on the night he recounted the confrontation and that Mr. Kellner was not far behind him. The trial court further concluded that Mr. Kellner had perjured himself either at trial or at the hearing; it did not determine when. If the only evidence presented at trial had been that of Mssrs. Kellner and Wiener, the judge added, then he would never have submitted the case to the jury.

Nevertheless, the trial court did not expressly hold that Mr. Kellner's trial testimony was incredible as a matter of law, though it came pretty close. Without such a finding, which I am reluctant to make sitting in a habeas corpus case, Mr. Kellner's credibility was a matter for the jury.

However, Mr. Kellner's credibility is not the only problem. The relevant part of his testimony consists entirely of the hearsay account of Mr. Kutska, who is an admitted liar. The jury obviously did not find him credible, since they convicted him despite his denial of guilt. The evidence also showed that he was skilled at deceit and manipulation. His self-serving claim that he merely stood back and watched the confrontation was contradicted by Mr. Gilliam's testimony, and the jury apparently rejected his unbelievable assertion that he

conveniently left just as things became violent. Mr. Kellner testified that he did not believe Mr. Kutska's account. Finally, even if one believes that he was being honest when he spoke to Mr. Kellner, as an active participant in the confrontation and beating, he might not have remembered accurately where the other defendants were at the time.

I am unable to conclude that a rational application of the reasonable doubt standard could establish Mr. Piaskowski's presence at the bubbler. This conclusion follows from the trial court's own findings. I believe that the trial court stopped just short of reaching that conclusion itself mainly because it deemed Mr. Kellner's testimony insignificant, a holding that the state appellate court rejected. *State v. Piaskowski*, 1998 WL 644758, *5 n. 7 (Wis. App. Sept. 22, 1998). Without a finding that the petitioner was at the bubbler, his presence with two defendants about five minutes after the murder has little importance, especially since they were seen together in the No. 7 coop where Mr. Piaskowski spends much of his time at work. If he was not at the bubbler, then there is no evidence that he knew what happened to Mr. Monfils. Therefore, there would be no basis for concluding beyond a reasonable doubt that the petitioner reported the victim missing for any other reason other than that he was actually missing and the petitioner wanted to get him in trouble.

Even if I were to assume that the evidence does support Mr. Piaskowski's presence at the bubbler, it is still not enough. The record leaves the trier of fact totally in the dark as to the critical question of whether the petitioner did anything that would make him guilty as a party to the murder. Did he beat the victim, did he only verbally confront him, or did he just stand by and watch? Did he agree with the others to dispose of the body, did he merely fail to stop them, or did he leave before any agreement was reached? Deciding what the petitioner did requires blind guessing. This is precisely why a defendant's mere presence cannot support a finding of guilt, either as a conspirator or an aider and abetter.

The one piece of evidence that might go beyond mere presence is Mr. Piaskowski's phone call. The question becomes whether this call is enough to permit a jury to find him guilty. I will consider liability for aiding and abetting first, then I will turn to the charge of conspiracy.

Under the aiding and abetting theory, the state must prove conduct, "either verbal or overt, that as a matter of objective fact aids another person in the execution of the crime." *Id.* at 1004, 500 N.W.2d 916. The call did not aid in the *execution* of the crime for the simple reason that the call was made after the crime was finished. A conspiracy to murder ends when the victim dies or, in certain cases, when the body is disposed of. *Gelosi v. State*, 215 Wis. 649, 656, 255 N.W. 893 (1934). Here both events occurred at the same time, about five minutes before the call. One who only helps a criminal escape detection is an accessory after the fact, not a party to the crime itself. *Rundle*, 176 Wis.2d at 1006–07, 500 N.W.2d 916.

Moreover, regardless of what he may have intended, the petitioner did not aid the perpetrators as a matter of *objective fact.* The call started a search that ended in the discovery of the victim's body. This act did not shield the defendants from suspicion. It is easy to see why the state abandoned its aiding and abetting theory both here and before the Wisconsin appellate court.

The foregoing analysis does not bode well for the state's conspiracy theory. As the Wisconsin Supreme Court has observed, guilt under both party-to-the-crime theories is often established by the same facts, and in certain cases the distinctions between the two theories are blurred. *Hecht*, 116 Wis.2d at 625, 342 N.W.2d 721. I believe the instant petition presents such a case.

The call itself does not reflect an agreement to participate in a conspiracy, since

the call was placed after Mr. Monfils' murder. *See State v. Charbarneau,* 82 Wis.2d 644, 652–53, 264 N.W.2d 227 (1978) (a conspirator must be one who is concerned with a crime prior to its actual commission). The state contends that the timing of the call, together with Mr. Piaskowski's presence during a part of the crime, supports the inference that he knew the victim was already dead. The state further infers that having such knowledge means that Mr. Piaskowski agreed to join in the objective of killing Mr. Monfils. Although the state's theory is plausible, there are simply too many other possibilities to allow a rational jury to accept it beyond a reasonable doubt. *See Evans–Smith v. Taylor,* 19 F.3d 899, 910 (4th Cir.1994) (a consistent theory is "fundamentally different" from a showing of guilt beyond a reasonable doubt).

Having assumed that the jury could have placed Mr. Piaskowski at the bubbler when the confrontation turned violent, we can further infer that he stayed until the beating ended. Thus, the jury was entitled to disbelieve the petitioner's claim that he reported Mr. Monfils missing because he wanted to get Mr. Monfils in trouble.

The next step—inferring that he knew the victim was dead—is too great a leap. That the petitioner saw the beating (already an inference) and was with two defendants five minutes later—in the No. 7 coop where he often is during his shift—cannot support a finding beyond a reasonable doubt that he was present when others decided to dispose of the body. It remains possible that he saw the beating, left to avoid involvement in the aftermath, then made the call because Mr. Kutska asked him to and because Mr. Monfils was actually missing.

Even assuming that Mr. Piaskowski knew what happened to Mr. Monfils, still another inference is required. The fact finder must further conclude that this knowledge could only come from participation in the murder. However, the petitioner could have seen what happened

without agreeing to it. Then he could have made the call because he feared disobeying Mr. Kutska, or even because he wanted to help him get away with it. Such conduct would be reprehensible, even criminal, but it does not make him a party to the murder itself. *See Charbarneau,* 82 Wis.2d at 652–53, 264 N.W.2d 227.

■ "An inference must be drawn from established facts which logically support the same." *Smith v. Chicago & N.W. Ry. Co.,* 246 Wis. 628, 632, 18 N.W.2d 352 (1945). The ultimate finding of guilt in this case required the jury to pile speculation on top of inferences drawn from more inferences. Each step along the way required the jury to eliminate one or more alternatives, thus multiplying the risk of error. Such a verdict is not rational. *See Kelly v. Roberts,* 998 F.2d 802, 809 (10th Cir.1993) (granting habeas corpus relief because the jury could not find guilt "[w]ithout impermissibly stacking inferences"). Taken in the light most favorable to the state, the evidence at most casts suspicion on Mr. Piaskowski, but that is not enough. *Id.*

The guilty verdict depended upon the rejection of too many reasonable possibilities. One is that the petitioner was not there when the perpetrators committed the crime. Even if he was there, the theory that he was a bystander is entirely consistent with the evidence. The court in *Evans–Smith v. Taylor,* 19 F.3d 899 (4th Cir.1994), in granting the writ because of insufficient evidence, stated:

> To start with the assumption that the crime was committed and then to show that each piece of circumstantial evidence can be explained in a consistent manner is fundamentally different from examining each piece of evidence and finally concluding beyond a reasonable doubt that the defendant was guilty. The prosecution has attempted to accomplish only the first alternative, not the second.

*Id.* at 910. That observation applies with equal force here. To take away the peti-

tioner's liberty based on the weak circumstantial evidence present here would do violence to the standard of proof beyond a reasonable doubt. His sentence of life imprisonment violates the Due Process Clause of the Fourteenth Amendment.

## B. § 2254(d)(1)

The Wisconsin appellate court thought otherwise, and this court cannot issue the writ of habeas corpus unless that decision resulted from an unreasonable application of *Jackson. Williams*, 120 S.Ct. at 1520. In order to put the decision in its proper context, it is necessary first to describe some of the postconviction proceedings before the appeal.

### 1. State court decisions

Throughout all of the state proceedings, the positions of the prosecution, as well as the decisions of the state courts, reflect a continuing struggle to articulate a coherent evidentiary case against Mr. Piaskowski. As the state explained prior to trial, the lack of evidence accounted for the delay in charging the defendants:

> Mr. Monfils was murdered on November 21st, of '92, and the charges were filed on April 12th of '95. The reason for the delay was lack of evidence. The most appropriate evidence that we have, the most significant, ... was the statements of Mr. Kellner.... That statement was obtained more than two years after the murder. To charge any earlier than that, your honor, I believe would have been an abuse of prosecutorial discretion to charge something without sufficient evidence.

At closing argument the prosecution pointed out that Mr. Kellner's testimony was pivotal, stating that "Kellner is crucial", and that "if you believe Brian Kellner then every one of these defendants is guilty, because they've all lied about it." The prosecutor repeatedly told the jury that he believed that Mr. Kellner was "one of the most, if not the most" credible witnesses.

The trial court, following a postconviction hearing at which Mr. Kellner recanted significant portions of his testimony, took a different view of his credibility, stating that "[i]t is clear he has committed perjury either at the time of the trial or the [postconviction] motion hearings." Nevertheless, the trial court concluded that whether or not he lied at trial was "immaterial" because his testimony was insignificant:

> His trial testimony established, if believed then, that certain named individuals were present at a confrontation near a "bubbler". It does nothing more than that. It does not establish a crime, it does not establish any individual as participating in that crime, it simply places those individuals at a location consistent with testimony given by many other witnesses. To say his testimony was critical to the conviction vastly and greatly overestimates its importance and ignores five weeks of other testimony and evidence presented.

In assessing the weight of the testimony of Mssrs. Kellner and Wiener, the trial court stated:

> Counsel for the defendants have ably, vigorously and correctly argued that a conviction cannot be sustained on the basis of such evidence. If indeed that was the only evidence in this case, the Court would never have allowed this case to go to the jury.

The trial court concluded that there was a "great deal" of other evidence to establish the defendants' guilt. However, the court did not discuss that evidence in any detail. The court's discussion consisted in large part of general observations about the length of trial, the number of witnesses and exhibits, the attentiveness of the jury, and the like. The court did state that the testimony of the defendants was the most significant evidence, but it did not mention any specific testimony, differentiate between any of the defendants, or describe why their testimony was important other than to note that the jury could have found that the defendants were not entirely truthful.

The trial court did not refer to the standard set forth in *Jackson*, and there is

nothing in the court's decisions that even remotely resembles the type of analysis called for in that decision. The court did not consider any of the elements of aiding and abetting or conspiracy under Wisconsin law, much less whether the state had proven them. The trial court did not analyze how any of the evidence applied to Mr. Piaskowski specifically, but rather it treated all of the defendants as a unified group.

In its unpublished opinion, the Wisconsin Court of Appeals also did not cite the *Jackson* standard, but it did refer to a state law standard that is functionally equivalent. "We may not reverse a conviction 'unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'" *Piaskowski*, 1998 WL 644758 at *1 (citing *State v. Poellinger*, 153 Wis.2d 493, 507, 451 N.W.2d 752 (1990)).

The appellate court's discussion of the evidence against Mr. Piaskowski, in its entirety, is as follows:

> Although there is no evidence that Piaskowski directly killed Monfils by throwing him into the vat, the jury could reasonably infer that Piaskowski was part of the conspiracy to beat Monfils and cover up his death. The evidence establishes that Piaskowski was present at the confrontation and told the foreman that Monfils was missing and that "some heavy shit" was "coming down." There was also evidence that Piaskowski and the other defendants kicked and beat Monfils. From this evidence, it was reasonable for the jury to infer that Piaskowski played a larger role than that of a mere observer, that he took overt action to beat Monfils and cover up the murder when he reported Monfils as missing. The jury could reasonably infer that Piaskowski knew that Monfils was missing because he knew Monfils had been dumped into a vat.

*Id.* 1998 WL 644758 at *3. The appellate court also concluded that "Piaskowski's

role reasonably reflects a tacit agreement and intent to beat Monfils and cover up the murder by disposing of Monfils' body." *Id.*

The appellate court also declined to consider whether the evidence supported the petitioner's conviction under the prosecution's aiding and abetting theory (abandoned by the state both in that court and here), thus leaving open the possibility that one of the two alternative theories underlying the conviction does not have a sufficient evidentiary basis. Though such a possibility does not by itself violate the Constitution (*see generally Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)), it is not desirable. *Id.* at 60, 112 S.Ct. 466.

### 2. "Unreasonable Application" of Federal Law

The United States Supreme Court in *Williams* observed that the term "unreasonableness", though familiar, is hard to define. 120 S.Ct. at 1522. The Court gave some guidance by explaining what an "unreasonable application" under § 2254(d)(1) is *not*. It is not a decision that is merely incorrect. *Id.* On the other hand, a decision is not reasonable merely because any reasonable jurist might endorse it; in other words, the test is objective rather than subjective. *Id.*

The Court in *Williams* also provided guidance through its application of § 2254(d)(1). The Court concluded, *inter alia*, that the Virginia Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and held that the petitioner was entitled to habeas corpus relief based his claim of ineffective assistance of counsel. *Id.* at 1515–16. I believe that the Wisconsin appellate court's application of *Jackson* was at least as unreasonable as the Virginia Supreme Court's application of *Strickland*.

The most serious error in the appellate court's decision is its conclusion that the jury could have found that Mr. Piaskowski

"kicked and beat" the victim. The appellate court did not mention what evidence could have supported such a finding. This court's review of the trial transcripts, comprising thousands of pages, has uncovered no such evidence. Not a single witness testified that Mr. Piaskowski kicked or beat the victim, and there is a total absence of any other proof.

If the Wisconsin appellate court believed that such an inference could be drawn from the petitioner's presence, it was plainly wrong. If mere presence cannot prove that he was a party to the crime, as the appellate court itself acknowledged, then such presence cannot possibly support the even larger speculative leap that he actively kicked and beat the victim. *See, e.g., Commonwealth v. Garrett,* 423 Pa. 8, 222 A.2d 902, 905–06 (1966) (where defendant was one of four people present when the victim was attacked, the evidence could not support his conviction for assault); *L.S. v. State,* 391 So.2d 329 (1980) (where defendant was one of two people who could have pushed the victim from behind, he could not be found guilty of battery).

I believe that this erroneous conclusion was critical to the state appellate court's analysis. The appellate court mentioned Mr. Piaskowski beating or conspiring to beat the victim four times in its discussion, which covers less than a page. By contrast, it mentioned Mr. Piaskowski's call to his supervisor twice. Had it not made the error, it seems possible that the state appellate court might have deemed the evidence insufficient. *See Williams,* 120 S.Ct. at 1524 ("It is impossible to determine ... the extent to which the Virginia Supreme Court's error ... affected its ultimate finding ....") (O'Connor, J., concurring).

The appellate court also ignored the problems that the trial court had with the testimony of Mr. Kellner, though it did, while discussing another issue, reject the trial court's determination that the testimony was unimportant. *Piaskowski,* 1998 WL 644758 at *5 n. 7. The appellate court

did not mention Mr. Kellner in its discussion of evidentiary sufficiency, despite the trial court's conclusion that he had perjured himself either at trial or at the postconviction hearing. Thus the appellate court's discussion of the evidence left open the possibility that Mr. Piaskowski's conviction rests upon perjured testimony.

In a separate section of the opinion, however, the appellate court explained that the trial court had held that Mr. Kellner's recantation was incredible as a matter of law. The trial court made no such finding, which would have been inconsistent with the trial court's assessment that Mr. Kellner committed perjury *either* at the trial *or* at the postconviction hearing. The trial court did not decide when, because "[a]t what time he was lying is immaterial."

In a footnote, the appellate court quoted what it deemed to be the trial court's incredibility finding: " 'This Court has a great deal of difficulty in accepting that the recantation is *in fact* credible ....' " *Id.* (emphasis added). This language expresses uncertainty as to whether the recantation was credible as a matter of fact, not certainty as a matter of law that no reasonable jury could believe it. The trial judge's uncertainty is consistent both with his doubt about precisely when Mr. Kellner lied, and with his earlier statement that at the time of trial he thought Mr. Kellner was barely credible. The trial court found it unnecessary to resolve those doubts, holding that even if the jury believed the recantation, it could not have affected the verdict, a holding the appellate court rejected. *Id.*

Section 2254(d)(1) requires this court to "take into account the care with which the state court considered the subject." *Lindh v. Murphy,* 96 F.3d 856, 871 (7th Cir.1996), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). "[A] responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." *Id.* The appellate court's one-paragraph discussion of the evidence against

the petitioner consists almost entirely of conclusions about what the jury could have found, as opposed to analysis of the evidence. The only specific evidence mentioned is the petitioner's reporting the victim missing and saying that "some heavy shit" was "coming down". This case involved a horrible crime and weak evidence of guilt. Given the seriousness of the issue and the substantial liberty interest at stake, the appellate court's review of the evidence cannot fairly be called careful, thoughtful or responsible.

Having concluded that the appellate court unreasonably applied *Jackson,* I will not consider whether it would have been possible to sustain his conviction in a way that was reasonable, though incorrect. I do not believe that § 2254(d)(1) requires me to construct such a hypothetical analysis. *See Cardwell v. Greene,* 152 F.3d 331, 339 (1998) (conducting *de novo* review where the state court decision was not reasonable); *Mitchell v. Prunty,* 107 F.3d 1337, 1340 n. 3 (9th Cir.1997) (same), *overruled on other grounds by Santamaria v. Horsley,* 133 F.3d 1242 (9th Cir.1998); *Helton v. Singletary,* 85 F.Supp.2d 1323, 1336 (S.D.Fla.1999) (respect for state court judgments under § 2254(d)(1) "should not extend into the field of blind assumptions on the state's behalf").

The United States Supreme Court's approach in *Williams* appears to be consistent with these authorities. There the Court held that the state court's decision was unreasonable because it misapplied precedent and failed properly to take into account certain evidence; it did not explore whether the state court could reasonably have sustained the conviction had it avoided those errors. 120 S.Ct. at 1515–16.

### III. CONCLUSION

The issuance of a writ of habeas corpus is a "grave remedy" reserved for "grave occasions". *Lindh,* 96 F.3d at 871. In my opinion, this is such an occasion. Mr. Piaskowski's petition will be granted. Because the evidence was not sufficient to support his conviction, the Double Jeopardy Clause of the Fifth Amendment bars a retrial. *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

### IV. ORDER

IT IS ORDERED that Mr. Piaskowski's petition for a writ of habeas corpus be and hereby is granted. The respondent shall release the petitioner within 28 days of the date of this order, unless he demonstrates his entitlement to a stay pending appeal. The clerk of this court shall enter judgment accordingly.

IT IS ALSO ORDERED that the respondent shall supplement the record, within 10 days of the date of this order, with copies of all postconviction motions and briefs filed in this matter in the Brown County Circuit Court.